# Callery's Estate.

*Marriage—Contract — Ceremony — Presumption — Cohabitation and reputation.*

1. Occasional cohabitation after an express but unfulfilled promise to have a marriage ceremony performed does not constitute a common-law marriage.

2. Cohabitation and reputation conjoined are the essential facts from which a presumption of common-law marriage arises.

Argued Oct. 27, 1909. Appeals, Nos. 127 and 128, Oct. T., 1909, by Anna Callery, from decree of O. C. Allegheny Co., Dec. T., 1908, No. 97, dismissing exceptions to adjudication in Estate of William V. Callery, deceased. Before FELL, BROWN, POTTER, ELKIN and STEWART, JJ. Affirmed.

Exceptions to adjudication.

The auditing judge, HAWKINS, P. J., filed the following adjudication:

STATEMENT.

The controversy in this case grows out of an alleged marriage of the decedent.

The material features developed by the evidence are these:

About midnight on October —, 1903, three men picked up two girls standing on the sidewalk whom they had never seen before, in the East End, and drove them to a sporting house in

the old city. All the members of the party, including the girls, had been drinking before, drank on their arrival at the sporting house, danced and sang in drunken style for an hour or two, when the girls were sent home in a cab, two of the men went to the street cars, and the third was not in a condition to leave the sporting house.

The last mentioned was W. V. Callery, member of a wealthy and prominent family, and himself a man of affairs, and one of the girls, Annie Clinton, then recently divorced, appears as the present claimant. The acquaintance thus begun between those two was resumed a day or two afterwards, flowers and candies were sent from time to time, and intimacy grew apace.

About two weeks after the first meeting Callery began, according to the claimant, to talk about getting married. "He asked me," she testified, "to come and live with him as his wife. I told him I was divorced. Of course he was a Catholic and I was a Catholic, and he didn't want to get married by a squire, a rabbi or preacher. He also stated that he had some business with his brother, J. D. Callery; after he would have a ceremony performed—he didn't want his brother to know we were living as man and wife."

When he asked her to live with him as his wife she told him she "would if he would have a ceremony performed. He said he would have that done later; that he was under obligations to his brother, J. D. Callery, and after that was past he would have a ceremony performed; but he said it didn't make a particle of difference; he said, 'you know thousands and thousands of people are married without a ceremony.'"

The discussion was renewed again and again and continued two weeks, she insisting on a proper ceremony, and he that the ceremony should be later, and she finally agreed to live with him as he had proposed. The subject of a ceremony was renewed by her again after they began to live together, but he always postponed the matter. In pursuance of this alleged agreement Callery took her two or three nights a week to what she said he called a lodging house; but which she soon learned, if she had not known, was a house of assignation; and yet with that knowledge continued these visits until June, 1904. The

purpose was, not to establish a home, but, to use claimant's own expression, "to have relations" with each other. In the meantime he used his rooms at the Schenley hotel, or resorted to the house of Mrs. White, whom he "kept"; while this claimant continued at her mother's residence. In June, 1904, claimant moved to a parlor which Callery had secured for her in the Colonial hotel; and at that hotel she remained, with the exception of two or three months while she was residing in a flat, until Mr. Callery died in September, 1906. While Mr. Callery made daily visits during this period he and she assumed and were known by the name of Mr. and Mrs. Phillips, she on several occasions introducing him as her "husband, Mr. Phillips," to persons who came to the room; he acknowledged his paternity of the child born to him, and paid all the expenses of living there; yet he still kept his rooms at the Schenley, divided his nights between her and Mrs. White, never introduced her as his wife, nor used the words husband or wife in his conversations nor in the many notes and telegrams which he sent her. His place of registration continued in the Schenley district as before his acquaintance with her. On the other hand, this claimant repeatedly stated that her relations with Mr. Callery were illicit, was on visiting terms with Mrs. White, though knowing her illicit relations with Callery, and when Callery was dying at his brother's she not only made no effort to assert the rights of a wife to be with him and care for him, but entered into negotiations for pecuniary settlement, which ended after his death in her signing, under the advice of her counsel, Mr. Dicken, a release in which the existence of the illicit relations was recited. True, she says that she was misled by her counsel into signing, and this is admitted by him; but there was afforded ample opportunity of informing herself of the contents and recalling the release before its delivery, and she failed to do so. And it is conclusive of her knowledge of the recital that on the delivery of the release she resumed her maiden name of Clinton. Mr. Callery's relations never heard of any claim of marriage until he was on his deathbed.

There is evidence that in the meantime she had relations

with other men than Callery and visited restaurants without an escort late at night.

## OPINION.

Assuming that claimant and Callery came together in pursuance of an express contract, failure of fulfillment of its condition of a marriage ceremony rendered the contract nugatory: Gross's Estate, 9 Pa. Dist. Rep. 76.

Claimant took the risk of fulfillment, and could only find a remedy in the event of failure in the criminal court. The fact that she again and again importuned Callery to have a ceremony of marriage performed shows that she regarded this as the one thing needful, but the weight of the evidence negatives the existence of an express contract of marriage.

The only direct evidence in support of its existence is that of claimant; and this is completely answered by her own attitude during the period covered by the controversy. The inception of her acquaintance with Callery in a "sporting house," their visits to an assignation house knowing its character, continued long after the date of the alleged contract, her friendly relations with Mrs. White, her repeated admissions that she was Callery's mistress, her importunities for the performance of a marriage ceremony, her negotiations and settlement on the basis of illicit relations, and her resumption of her maiden name after the settlement, utterly discredit her story.

Resting the case on the theory of a common-law marriage, claimant fell far short of the legal measure of proof required. Cohabitation and reputation conjoined are the essential facts from which a presumption of common-law marriage arises.

"The legal idea of cohabitation" (said AGNEW, C. J., in Yardley's Estate, 75 Pa. 207), "is that which carries with it a natural belief that it results from marriage only. To cohabit is to live or dwell together, to have the same habitation; so that where one lives and dwells, there does the other live and dwell always with him. The Scotch expression conveys the true idea perhaps better than our own, 'the habit and repute' of marriage. Thus when we see a man and woman constantly living together where one is dwelling, there the other con-

stantly dwells with him, we obtain the first idea or step in the presumption of marriage; and when we add to this that the parties so constantly living together are reputed to be man and wife, and so taken and received by all who know them both, we take the second thought or second step in the presumption of the fact of marriage. Marriage is the cause, these follow as the effect. When the full thought contained in these words, cohabitation and reputation of marriage, is embraced, we discover that an inconstant habitation and a divided reputation of marriage, carry with them no full belief of an antecedent marriage as the cause. The irregularity in these elements of evidence is at once a reason to think there is irregularity in the life itself which the parties lead, unless attended by independent facts which aid in the proof of marriage, without concomitant facts to prove marriage, such an irregular cohabitation and partial reputation of marriage availed nothing in the proof of marriage."

Tested by this principle it will be seen that the relations of claimant and Callery were lacking in "habit and reputation" of marriage. They were not "constantly living together." The fact of Callery's retention of his rooms at the Schenley and his division of his nights between this claimant and Mrs. White are ample evidence of this.

There was a "repute" prevailing in the Colonial hotel of their marital relations as "Mr. and Mrs. Phillips," but there was no pretense that this "repute" extended to Callery's family and acquaintances until a short time before his death. Even if this view were doubtful, claimant's admission of her illicit relations with him, her negotiations and settlement on this basis, and her resumption of her maiden name, would put it beyond question. There was nothing in the conduct of Callery inconsistent with this conclusion.

"A man," says SHARSWOOD, J., in Bicking's Appeal, 2 Brews. 202, "may live with his kept mistress in such a way as to create a kind of repute of marriage among some persons; he may even, to gratify her, allow himself to be held out or hold himself out to her friends and acquaintances as her husband; may be a constant visitor, sleep and often eat at her house;

may recognize the fruit of the connection as his children and manifest affection and tenderness for them; yet the evidence falls far short of that which ought to satisfy the mind, that there was an actual agreement to form the lawful relation of husband and wife."

An acquaintance begun in a brothel requires more change than mere observance of the proprieties of a hotel to convert it into the sacred relation of marriage. Evidence of so radical a change must obviously be positive and unmistakable in character. The assumption of a fictitious name, irregular cohabitation and repute, restricted to a hotel, and the absence of voluntary use of the title wife, are the circumstances suggestive only of continuance of illicit relations. If the case were in doubt, the birth of issue would raise the presumption of legitimacy suggested by claimant's counsel, but the facts leave no room for doubt.

### CONCLUSION.

The court therefore finds that there was neither an expressed nor an implied contract of marriage between this claimant and William V. Callery.

*Error assigned* was decree dismissing exceptions to adjudication.

*John M. Freeman,* with him *D. T. Watson, George H. Stengel* and *Ernest C. Irwin,* for appellants.

. *W. B. Rodgers,* with him *Wilson & Evans,* for appellees.

PER CURIAM, January 3, 1910:

A careful review of the voluminous testimony in this case discloses nothing that would warrant a reversal of the decree entered by the orphans' court.

The assignments are dismissed, and the decree is affirmed on the opinion of the learned president of that court.