## CAVANAUGH v. CAVANAUGH.

No. 18576. Opinion Filed March 5, 1929.

W. H. Robinson and Champion, Champion & Fischl, for plaintiff in error.

G. V. Pardue, for defendant in error.

HERR, C. This is an action for divorce and division of property brought in the district court of Carter county by Elsie Biggs Cavanaugh against Jack Cavanaugh. The decree was in favor of plaintiff. Defendant appeals.

This litigation arises over property rights. The plaintiff relies on a common-law marriage. Such marriages are recognized in this state. Palmer v. Culley, 52 Okla. 454, 153 Pac. 154; In re Sanders' Estate, 67 Okla. 3, 168 Pac. 197; Thomas v. James, 69 Okla. 285, 171 Pac. 855; Dunlap v. Dunlap, 88 Okla. 200, 212 Pac. 608; Baker v. Jack et al., 112 Okla. 142, 241 Pac. 478; Fisher v. Fisher, 116 Okla. 129, 243 Pac. 730.

The question, then, to determine is: Does the evidence establish a common-law marriage? We think this question must be an-

swered in the negative. The testimony of the plaintiff, herself, negatives such marriage. She testifies that she first met defendant in the year 1917; that she was at that time married to John Holmes and living at Blackwell, Oklahoma; that Mr. Cavanaugh furnished her the money to procure a divorce; that she was divorced from Mr. Holmes on August 20, 1917; that in June, 1918, she and defendant made a trip together through Arkansas and Texas; that they did not, on such trip, claim to be husband and wife, nor did they assume such relationship; that sometime after their return from that trip they came to Wilson, Oklahoma, and moved into a house belonging to Mr. Cavanaugh and there lived together as husband and wife and continued so to live for a period of about eight years.

The plaintiff, herself, does not testify as to any agreement ever having been made between herself and defendant to immediately become husband and wife. The only testimony offered by her on this question is as follows:

"Q. During the time that you lived in this place you called your home, at the time Mr. Cavanaugh was there, did you and he maintain the relations of husband and wife and did you live together as husband and wife? A. Yes, sir Q. You did? A. Yes, sir. Q. At the time you moved into the Blondy Jones place, did Mr. Cavanaugh tell you anything about getting married or whether it was necessary to be married or anything of that kind? A. He said he would. Q. Did you ever have a marriage ceremony performed? A. No, sir. Q. Why? A. Because he kept putting it off; said we had better wait until after while. Q. Did he ever tell you it wasn't necessary? A. He said in this way; When I kept insisting we get married he would say that we were just the same as married, but I always said I didn't feel that way."

On cross examination, plaintiff testified that her maiden name was Biggs; that during all the time she was living with defendant she went under the name of Elsie Biggs; that she always denied her marriage; that she told her own children she was not married. She at no time publicly claimed to be the wife of Mr. Cavanaugh, but as to the public she was only his housekeeper, and her testimony discloses that she frequently told her friends and neighbors that she was not married to Mr. Cavanaugh and that she was maintaining separate rooms from him.

Plaintiff further testifies that she did not regularly occupy the same room with defendant, but that she did part of the time occupy the same bedroom with him.

Plaintiff was questioned, on her redirect examination, as to certain relations assumed by herself and defendant upon an occasion when they visited in the home of one of her married daughters. Her testimony relative thereto is as follows:

"Q. Were you ever in his company at Mrs. Gordon's house in which he wrote a letter to her telling her the next time her new papa came over to have chicken dinner? A. He wrote a letter and left it on the table saying the next time your new papa comes have chicken dinner. By the Court: Did you and he occcupy the same room when you would go to see her? A. No, sir. By the Court: Why didn't you? A. Because I didn't think I ought to; they wouldn't have let us stay there if we had."

This is, in substance, the testimony upon which plaintiff relies to establish a common-law marriage. In our opinion, it falls far short of proving the elements necessary to constitute such marriage. There is no showing of any agreement to immediately become husband and wife. No open assumption of such relationship. No claim made by either, publicly or otherwise, that they were, in fact, husband and wife, but on the contrary frequently made flat denials thereof. This evidence establishes nothing more than a promise on the part of the defendant to marry plaintiff at some future date, and that, following such promise, the parties assumed illicit relations. This is wholly insufficient to establish marriage. On this question, in 18 R. C. L. 393, after stating that there are some old authorities tending to sustain the proposition that a promise of future marriage followed by illicit intercourse is sufficient to establish a common-law marriage, the author says:

"Thus when it is shown that the parties after their engagement were all along looking forward to a formal ceremony to make them husband and wife, and never agreed or consented to become such without it, the prima facie case established by intercourse is overcome. And the prevailing rule in this country is that at the time of the intercourse the parties must actually give themselves to each other in the marriage relation. In other words, there must be cohabitation and that cohabitation must be matrimonal, and this means that the parties must regard the marriage relation as existing. They must actually dwell together as husband and wife, mutually recognizing each other as such in pursuance of the marriage promise, and actually intending to constitute the relation of husband and wife. This approaches an entire rejection of the doctrine of marriage per verba de futere, since it requires cohabitation, which, together with reputation, would, even if there were no express prom-

ise, raise a presumption of marriage. In some jurisdictions the doctrine has been rejected in toto, and it seems to be a shadow of its former self, even in the jurisdictions that have not expressly repudiated it as a whole; and it is a fair conclusion that the doctrine is nearly, if not quite, obsolete."

While it is not essential, to constitute a common-law marriage, that an express promise to become husband and wife be established, it is necessary that facts and circumstances be established from which such promise may be implied or inferred. There should at least be some evidence to the effect that the parties themselves regarded the marriage relation as presently existing. There should be an open assumption of such relation and a recognition of each other as husband and wife. These elements, under the testimony of the plaintiff herself, are totally lacking. The evidence fails to establish a common-law marriage.

Judgment should be reversed, and the cause remanded, with directions to vacate the decree and enter judgment in favor of the defendant.

BENNETT, HALL, JEFFREY, and DIFFENDAFFER, Commissioners, concur.

RILEY, J., dissents.

By the Court: It is so ordered.

Note.—See under (1) anno. L. R. A. 1915E, 8; 39 A. L. R. 538; 18 R. C. L. p. 391 et seq.; 3 R. C. L. Supp. p. 808; 4 R. C. L. Supp. p. 1184; 5 R. C. L. Supp. p. 981: 6 R. C. L. Supp. p. 1063. See "Marriage." 38 C. J. §94, p. 1313, n. 43; §105, p. 1331. n. 97.