## BENNIE NICHOLS v. STATE.

No. A-7909.   Opinion Filed April 25, 1931.
(298 Pac. 886.)

R. Donald Slee, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

CHAPPELL, J.   Plaintiff in error, hereinafter called defendant, was convicted in the district court of Pontotoc county of the crime of murder, and his punishment fixed by the jury at death.

The evidence of the state was that the defendant, a negro, killed Jack Horton, night watchman of the Ada Compress Company, by hitting him on the head and body

with a heavy club, thereby crushing his skull and causing immediate death; that the killing was a most brutal one, the motive being robbery.

Defendant was jointly charged with one Bessie Simpson, a negro woman. Defendant took a severance, and the state elected to try him first. The Simpson woman testified for the state in this trial, over the objection and exception of the defendant, and the fact of her giving testimony forms the basis of the chief assignment of error relied upon by counsel for defendant for a reversal of the judgment.

The evidence of the state is sufficient to support the verdict of the jury, and warrants the imposition of the extreme penalty of death, unless the errors complained of by defendant are sufficient to require a reversal of the case.

The errors complained of are: (1) That the court erred in permitting Bessie Simpson to testify as a witness against the defendant, over his objection and exception; (2) error in not granting defendant's request to instruct the jury to disregard the statement of the county attorney in so far as it dealt with the evidence proposed to be given by Bessie Simpson.

These two assignments of error involve the same legal proposition, and will therefore be considered together.

It was the claim of defendant that Bessie Simpson was his common-law wife, and hence incompetent to testify as a witness against him; this not being a crime committed against her.

Section 2699, C. O. S. 1921, provides:

"Except as otherwise provided in this and the following chapter, the rules of evidence in civil cases are ap-

plicable also in criminal cases: Provided, however, that neither husband nor wife shall in any case be a witness against the other except in a criminal prosecution for a crime committed one against the other, but they may in all criminal cases be witnesses for each other, and shall be subject to cross-examination as other witnesses, and shall in no event on a criminal trial be permitted to disclose communications made by one to the other except on a trial of an offense committed by one against the other."

Section 2696, C. O. S. 1921, provides:

"When two or more persons are included in the same indictment or information, the court may, at any time before the defendants have gone into their defense, on the application of the county attorney, direct any defendant to be discharged from the indictment or information, that he may be compelled to be a witness for the state."

Section 2696, supra, has been construed in Brown v. State, 9 Okla. Cr. 382, 132 Pac. 359; Montgomery v. State, 13 Okla. Cr. 652, 166 Pac. 446; Bradshaw v. State, 16 Okla. Cr. 624, 185 Pac. 1102.

There was therefore no legal impediment to the codefendant testifying voluntarily, unless the facts disclose that she was the wife of defendant at the time she gave the testimony.

When the state offered Bessie Simpson as a witness, the following record was made:

"Direct Examination

"By Mr. Dean:

"Q. State your name to the court and jury? A. Bessie Simpson.

"By Mr. Slee: I would like to conduct a preliminary examination of this witness, if the court please—

"By the Court: All right—

"By Mr. Slee:

"Q. Bessie, how long have you known Bennie? A. Nearly two years.

"Q. Have you known him ever since he has been here in Ada? A. Yes, sir.

"Q. Since he has been in Ada? A. Yes, sir, and before.

"Q. Is there any reason why you and Bennie shouldn't have married?

"By Mr. Dean: We object to that as incompetent, irrelevant and immaterial—

"By the Court: You would have to prove straight marriage—

"By Mr. Slee:

"Q. You say you have been living with him for the past eight months? A. Yes, sir.

"Q. Did you consider him your man, Bessie?

"By Mr. Dean: We object to that—

"By the Court: You would have to prove straight marriage—let her state the facts—

"Q. (by Mr. Slee) You have lived at Bennie's house? A. Yes, sir.

"Q. Bennie furnished the house for you? A. Yes, sir.

"Q. Bennie furnished the furniture? A. Yes, sir.

"Q. He bought the food? A. Yes, sir.

"Q. You lived with him as husband and wife? A. Yes, sir.

"By Mr. Slee: On this showing made, we hold this witness can't testify in this case—that she is the common-law wife of Bennie Nichols.

"By Mr. Dean:

"Q. You are not husband and wife, are you? A. No, sir.

"Q. You never held yourself out as his wife? A. No, sir.

"Q. He never held you out to the people that he was your husband or you was his wife- A. No, sir.

"Q. You never married him? A. No, sir.

"By the Court:

"Q. You mean you just stayed together, but neither one of you claimed the other as husband or wife? A. Yes, sir.

"By Mr. Dean:

"Q. Well, did you intend to be married or just tell people you were married to give you an excuse to live together? A. Yes, sir.

"By Mr. Slee: I think the court should take judicial knowledge that a common-law marriage is recognized in this state, your honor—

"By the Court:

"Q. During the time you lived with him, did you associate with more than one man? A. Yes, sir.

"Q. You did associate with more than one? A. Yes, sir.

"Q. Any time you wanted to? You didn't just associate with him alone? A. Oh, he is the only one I associate with—colored.

"Q. Did you claim to be his wife just as a matter of convenience? A. There wasn't no convenience.

"Q. Or did you really intend—what was your real intent about your marriage— A. I was intending to marry him if he would marry me.

"Q. (by Mr. Dean) But you never had married? A. No.

"Q. And you really didn't consider you were married until you were married? A. No."

Since the defendant failed to take the witness stand, we have nothing directly from him as to what his relations with Bessie Simpson were, and must rely entirely upon her testimony to determine the question of whether a common-law marriage relation actually existed between the defendant and Bessie Simpson.

In Draughn v. State, 12 Okla. Cr. 479, 158 Pac. 890, L. R. A. 1916F, 793, this court said:

"Marriage in its legal sense is a civil contract, and where competent parties agree to become man and wife, it is not indispensable that a marriage license issue and that a clergyman be present to authorize and confirm the contract, in order to give validity to the marriage.

"Statutes regulating the mode of entering into the marriage contract do not confer the right that has existed ever since there were two human hearts, and such statutes are not within the principle that, where a statute creates a right and provides a remedy for its enforcement, that remedy is exclusive; hence common-law marriages in this state, although in derogation of the statutory directions as to formalities, are valid, since such marriages are not expressly forbidden by our statutes."

Two questions are presented by the record in the case at bar:

(1) What constitutes a common-law marriage?

(2) Do the facts in this record show Bessie Simpson to be the common-law wife of the defendant?

In re Love's Estate, 42 Okla. 478, 142 Pac. 305, L. R. A. 1915E, 109, that court said:

"A common-law marriage exists where competent parties agree to be and become immediately man and wife and pursuant thereto enter into and maintain thereafter the marriage relation."

In the case of Hughes v. Kano, 68 Okla. 203, 173 Pac. 447, 448, that court defines common law as:

"A common-law marriage may exist in this state, and when parties capable of entering into the marital relation agree to be and become husband and wife, and in pursuance of such agreement enter into and thereafter maintain marriage relation, a common-law marriage exists."

To the same effect is the case of Baker v. Jack, 112 Okla. 142, 241 Pac. 478.

In re Wells' Estate, 123 App. Div. 79, 108 N. Y. S. 164, 166, that court said:

"A common-law marriage is defined as any mutual agreement between the parties to be husband and wife in praesenti, especially where it is followed by cohabitation, if there is no legal disability on the part of either to contract matrimony."

In re Callery's Estate, 226 Pa. 469, 75 A. 672, that court said:

"A common-law marriage is not affected by occasional cohabitation after an express promise to have a marriage ceremony performed, which is not fulfilled. Cohabitation and reputation conjoined are the essential facts from which a presumption of common-law marriage arises."

The first essential of a common-law marriage is a mutual understanding and agreement between two parties capable of entering the marital relation to become husband and wife.

Assuming that Bessie Simpson and Bennie Nichols neither had any legal impediment to contracting marriage,

under the evidence did they ever agree so to do? Bennie, the defendant, is absolutely silent as to what his intentions were. Since he says nothing, and there is no other evidence in the record upon the subject, we have to rely upon what Bessie Simpson says.

It will be noted from the evidence of Bessie Simpson that she testified that they were not husband and wife; that they never held themselves out as husband and wife; that they just stayed together, and neither one claimed the other as husband or wife; that the witness associated with other men while maintaining this relation with the defendant; that witness intended to marry defendant if he would; and that she did not consider they were married.

It clearly appears from the evidence that there was no mutual agreement in praesenti between these parties to be husband and wife before they began to cohabit with each other. Theirs was simply a state of fornication and not marriage. It takes more than this to create the relation of common-law marriage in the state of Oklahoma. The interpretation of the law as contended for by defendant would permit him to commit a most dastardly murder and then defeat justice by prohibiting the state from using as a witness the woman with whom he is maintaining illicit sexual relations on the pretense that she is his common-law wife.

The trial court did not err, therefore, in permitting the witness, Bessie Simpson, to testify for the state and against the defendant.

Defendant next contends that the court erred in permitting the witness Luther Condron to testify to the finding of a pocketbook at the scene of the tragedy, for the reason that there is no testimony that said pocketbook

was the property of the deceased, Jack Horton, or of the defendant.

One Stubblefield, a witness for the state, testified to the finding of the pocketbook within four or five feet of the body, and that it was the property of Jack Horton, the deceased. This evidence was admissible for the purpose of establishing robbery as the probable motive for the crime. It was also admissible as tending to corroborate the testimony of Bessie Simpson.

Defendant next contends that the court erred in permitting the witness Lillian Peek to testify concerning certain voices heard by her on the night of the murder.

Bessie Simpson testified that, when she and Nichols were returning from the compress to the room they were occupying on the night of the homicide, they passed a house where a dog barked, and that some conversation by defendant followed.

Lillian Peek testified that she was sick that night and was up to take medicine at about the hour the murder occurred; that she lived on the road from the compress to the room the defendant and Bessie Simpson occupied; that she heard a dog bark and heard a woman's voice, but was unable to state that this was the voice of Bessie Simpson. Her testimony was competent as a circumstance tending to corroborate Bessie Simpson in her statement that she and the defendant were there that night and that a dog barked, as she testified.

Defendant next contends that the judgment is contrary to instruction No. 5, in that there is no evidence of a premeditated design to effect death.

Sections 1734 and 1735, C. O. S. 1921, in substance provide that a design to effect death is inferred from the

fact of the killing, and that a design to effect death suffi-
cient to constitute murder may be formed instantly be-
fore committing the act.

Under the evidence and the facts and circumstances
in this case, there is no merit in this contention.

Finally, defendant contends that the witness Bessie
Simpson is an accomplice, and that there is no sufficient
corroboration of her testimony.

The evidence of the state was that the defendant went
to the place where the Simpson woman was staying at
about 4 o'clock in the morning, and forced her to get up
and accompany him to the compress for the purpose of
robbing the deceased while she was having intercourse
with him, that the witness received only $1 from deceased,
and that, when she told defendant she had not taken de-
ceased's money from his person, defendant in anger seized
a club and proceeded to beat the deceased to death.

It appears from these facts that whatever Bessie
Simpson did was done because of the duress of defendant,
and not voluntarily, and that, while she was present at
the scene of the homicide, she took no part in it by way
of word or act of encouragement or assistance.

In Moore v. State, 4 Okla. Cr. 212, 111 Pac. 822, this
court said:

"It is error to instruct the jury that a person who
stands by and consents or acquiesces in the commission of
a crime is a participant therein. To be concerned in the
commission of crime, one must either commit the crime
himself, or procure it to be done, or he must aid, assist,
abet, advise, or encourage its commission."

In Carrico v. State, 16 Okla. Cr. 118, at page 124,
180 Pac. 870, 872, in the body of the opinion, this court
said:

"Mere acquiescence is not sufficient to establish guilt. It must be shown either that the defendant committed the offense, or that he aided, abetted, or assisted in its commission, or that he procured it to be done."

There is no merit to the defendant's contention that Bessie Simpson was an accomplice.

In addition to this, Bessie Simpson is corroborated by the finding of the club with human blood on it. She is corroborated by the fact that the shoes of defendant that he wore that night had human blood on their soles. She is corroborated by the finding of the deceased's empty purse. She is corroborated by the testimony of Annie McMillan.

It was not necessary that the testimony of Bessie Simpson be corroborated, but, even so, she is corroborated upon all the material facts in the case by other competent evidence.

The record in this case discloses a most brutal murder. The overwhelming evidence of guilt adduced by the state against the defendant and left unexplained by him fully justifies the extreme penalty imposed by the jury.

For the reasons stated, the cause is affirmed.

The original time for the execution having passed, owing to the pendency of this appeal, it is considered, ordered, and adjudged by this court that the judgment and sentence of the district court of Pontotoc county be carried out by electrocution of the defendant on the 10th day of July, 1931.

DAVENPORT, P. J., and EDWARDS, J., concur.