## LESTER WHEATON v. STATE.

No. A-10757.   Oct. 22, 1947.

(185 P. 2d 931.)

Springer & Springer, of Stillwater, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

JONES, J.   The defendant, Lester Wheaton, was charged by information filed in the district court of Payne county, with grand larceny by committing the theft of $2,100 from one Bernice Intes, on or about December 14, 1944. Upon a trial to a district court jury, the defendant was found guilty with the punishment left to the court. After motion for new trial was overruled, the trial judge sentenced the defendant to serve a term of two years imprisonment in the State Penitentiary, and he has appealed.

It is contended that the prosecuting witness was an incompetent witness for the reason that the proof showed that she was the common law wife of the defendant, and that, therefore, the court erred in overruling the objection interposed to the competency of the witness to testify. Secondly, it is contended that the district court of Payne county had no jurisdiction of the offense for the reason that the proof showed that the offense, if any, was committed in Tulsa county. Thirdly, it is contended that the evidence is wholly insufficient to sustain the conviction. As all of these questions are dependent upon the proof that was established at the trial, a summary of the evidence will be given.

The defendant during the time involved in this controversy was a resident of Glencoe, a small town in Payne county. Bernice Intes came to this country from Lithuania when she was about ten years of age and had lived most of her life in Chicago. She was 49 years of age at the time of the trial. Bernice and the defendant had both subscribed to a magazine published under the name of the Correspondence Club, but it is genereally referred to in the evidence as a matrimonial agency.

The prosecuting witness testified that she and the defendant started corresponding about eight months before they met. In this correspondence, she advised the defendant that she had saved up quite a large amount of money and that she was interested in matrimony. The defendant came to Chicago about November 25, 1944, and stayed there about three days. They agreed to get married, but defendant insisted they go to Kansas City where he had left some trucks in which he had brought some cattle to the market. The parties went to Kansas City and defendant left the prosecutrix for a short time, presumably

to call about his trucks. When he returned he said that the trucks had gone. The defendant said that he had lost his money and then suggested they go to defendant's mother's home at Glencoe. There the marriage was again postponed when defendant told her that he was waiting for a check for the cattle he had sold in Kansas City. The defendant then suggested to the prosecutrix that she transfer her money from Chicago and invest it in stock in the Federal Home Loan Bank.

The proof showed that the prosecutrix had been working for several years. By attending night school she had received a high school diploma. During the war she had worked in a defense plant and had saved $2,108.89 which was on deposit in a Chicago bank. In addition, she had several hundred dollars worth of government bonds which had been purchased for her by her employer making regular deductions from her weekly pay check.

The money which she had on deposit in Chicago was transferred to the Glencoe bank and arrived there on December 14, 1944. The defendant then suggested that she immediately withdraw her money from the Glencoe bank and invest it. Accordingly, on December 14th, the prosecutrix withdrew her money from the Glencoe bank with the understanding that she and defendant were to take the money to Tulsa, get married and invest the money in a Federal Home Loan institution of which the defendant had spoken to her. The money that was withdrawn from the Glencoe bank was given to the prosecutrix in $20 bills. After the withdrawal of the money from the Glencoe bank, defendant and Bernice returned to the home of defendant's mother. While defendant and Bernice were upstairs a short while before departing for Tulsa, the defendant gave Bernice some envelopes and suggested

that she put the money in the envelopes and place them in her pocketbook for her protection. The prosecutrix testified that she put the money in four or five envelopes, placed them in her pocketbook, put the pocketbook in her trunk, locked it, and placed the key in her coat pocket which was hanging on a clothes hanger in the upstairs room. The prosecutrix then went downstairs to the room she had been occupying to prepare for the trip to Tulsa, leaving the defendant upstairs in the room with the money. Prosecutrix testified that about 30 minutes later after she had finished dressing she went back upstairs, unlocked the trunk, took her pocketbook, went downstairs with the defendant, and they went to Tulsa. That she had the pocketbook in her possession all the remainder of that day. That she and defendant occupied the same bed that night, but that when she retired she placed the pocketbook under the mattress between the mattress and the springs and that when she awakened the next morning the pocketbook was in the same position it had been placed when she went to bed. The next morning the parties went shopping; the defendant bought her a dress, a ring, and some other articles. The prosecutrix then went to a beauty shop for a beauty treatment and while she was sitting in the shop she opened her pocketbook and decided to open one of the envelopes. When she did she found the envelopes were each filled with newspaper clippings and the money had been taken. She then ran out of the beauty shop without receiving her beauty treatment to look for the defendant. She was unable to find him at that time so she placed a long distance telephone call to defendant's mother to advise her what had occurred. A short time later she saw the defendant walking down the street with another man, so she ran up and grabbed him by the arm. That she told the defendant what had happened and de-

fendant said, "I played a joke on you, I took your money to protect you from getting in trouble and I have invested it in a Federal Home Loan." That defendant laughed and quieted her down and said, "I have to protect you." That she asked the defendant then when they would get married and defendant said that he had to go to Cleveland, Oklahoma, and see about a barbershop and from there they would go to Kansas City and get married.

That she later, after their return to Glencoe, saw a letter from a woman written to defendant in which was a statement by the woman that she still loved the defendant and would come back to him if he would go to work and live at Shawnee instead of Stillwater. That the defendant then told her that he had been married, but that he had been divorced from the woman on November 14, 1944, and that under the law in Oklahoma he had to wait 90 days before he could remarry.

That the defendant kept complaining to her about being short of money and asked her to cash her war bonds. That she asked the defendant about the $2,100 which he had taken and defendant said, "it is all invested, and after the war we will buy our own home, our own farm." That they rented a farm close to Stillwater and Lester paid $150 advance rent for a year and they moved a little furniture out to the farm. That Lester wanted an automobile, so they went to Cushing and bought a second hand Chevrolet sedan for $485. That the defendant paid for it. That the defendant did not work any at all after she met him, but he told her that he had lost two fingers while working for the Santa Fe Railway and was drawing a pension for that disability. That she and the defendant were living together on the farm as man and wife. That she kept insisting to defendant that he get a job. That finally

one day the defendant told her he was through with her and left. That he did not ever give her back any of her money and they never did get married. That she went to the sheriff's office and made complaint against the defendant and related to the sheriff and county attorney what had occurred. On cross-examination the prosecutrix testified that she had been married but had obtained a divorce in 1925. She further testified that she and defendant lived together at the farm sleeping in the same bed and that defendant introduced her to different people as his wife.

Jim Robb testified that he was in the automobile business in Cushing in Payne county. That on January 3, 1945, he sold a 1936 Chevrolet sedan to the defendant for $485 and that defendant paid him in twenty dollar bills, except one five dollar bill.

Clarence McGinty testified that he was cashier of the bank at Glencoe. He testified that he arranged for the transfer of money in the sum on $2,108.29, for Bernice Intes from a Chicago bank to his bank and that the money was withdrawn from his bank on December 14, 1944.

C. O. Shingleton testified that he rented a ten-acre tract to the defendant, Lester Wheaton, which was located northeast of Stillwater, in January, 1945, for $150 cash, which was to pay for a year's rent. That the defendant paid him in $20 bills.

J. R. Bradley, under sheriff, testified that he made the arrest of the defendant; that he asked the defendant whether he was married to the prosecutrix and defendant said he was not, but that he was paying her $30 a month to keep house for him.

The defendant testified in his own behalf that he had been convicted on four felony charges. One conviction was in the federal court for transporting a stolen car across the state line, once for forgery, one conviction in Texas for swindling, and one five year sentence in Tulsa county for obtaining property under false pretenses.

He further testified that the prosecutrix wrote him the first letter along about April, 1944, and that on July 1, 1944, he went to Chicago and visited with her. That the prosecutrix came to Oklahoma to see him on September 10th, and stayed just one day and returned to Chicago. That he had been married but was divorced by his former wife in Alabama on November 14, 1944. That we went to Chicago in the latter part of November, 1944, to see the prosecutrix. That they discussed about getting married and he told her he would have to wait six months. That they then agreed to wait until the 15th day of May, but she was to come on to Oklahoma and stay until the six months period elapsed and then they would get married. He admitted knowing that the prosecutrix withdrew $2,100 from the Glencoe bank and stated that they went to Tulsa thereafter for the purpose of buying an automobile. Defendant specifically denied that the prosecutrix mentioned to him while they were in Tulsa about having lost any money and specifically denied that he had told her he had taken her money and invested it for her. Defendant stated that he had about $512 when the prosecutrix came to Oklahoma. That he spent his own money in buying the presents for the prosecutrix in Tulsa. That the prosecutrix gave him the money to pay for the automobile which was purchased in Cushing, and also she gave him the money to pay for the furniture which was placed in the house at the farm which they leased. The defendant further testified:

"Q. Did you ever, at any time at all, ever have any other intentions, except in good faith to get married to her when the six months period was up from the 14th day of November, 1944? A. I did not. I will marry her now, if you will bring her up here."

On cross-examination defendant stated that he did not carry a bank account but was carrying the $500 which belonged to him in his billfold. He was asked if he had not told the county attorney at the time of his arrest that the prosecutrix could not have $2,100, as she had never had more than a $10 bill in her possession and defendant denied making this statement. He denied telling the prosecutrix that he had a pension from the Santa Fe Railway and testified that he lost his finger and thumb while working as a trusty in the penitentiary at West Virginia. He denied purchasing a barbershop at Pawnee in the name of his brother and denied having any interest in the barbershop which the proof showed was purchased about December 15 or 16, 1944.

The mother of defendant testified in his behalf. That she tried to talk to the prosecutrix about Lester Wheaton, but that prosecutrix said, "I have known him 18 years, we used to work in the barbershop together in Chicago for nine months." She swore that Lester started to go to Kansas to work and she heard the prosecutrix say she had rather spend another thousand than let him go. She said that she saw the prosecutrix carrying the defendant's billfold and one day when the defendant wanted some money she took his billfold out of her purse and gave him a $20 bill out of the billfold. She admitted that on the occasion of the trip to Tulsa by defendant and prosecutrix that she received a message from the prosecutrix at Tulsa by phone, but upon objection being interposed by counsel

for defendant, she was not allowed to relate what was contained in the message.

Bert Wheaton, brother of defendant, testified that he was in the barbershop business and was running a barbershop in Cleveland, Okla., on December 15th, when the defendant and prosecutrix came by his shop. That he purchased a barbershop from a Mr. Fletcher at Pawnee on the 17 or 18 of December, 1944, but that the defendant did not furnish the money for the purchase of the shop. That the defendant and his wife came by his place on the day they had bought some furniture in Pawnee and had lunch with him. That he saw the prosecutrix give defendant five $20 bills to pay for the furniture. On cross-examination the witness denied having made the statement to the officers at the time of arrest of defendant that he did not know the woman had any money but if she did have and Lester took it she should have it back. He further stated that at the time the defendant and prosecutrix were on their way to Tulsa that defendant stopped in the barbershop and told him that Mr. Fletcher at Pawnee wanted to see him about selling the barbershop.

Wilma Jane Shipley testified that the defendant had performed work for her in 1942, and that she had found him trustworthy.

On rebuttal the state offered a transcript of the papers filed before the justice of the peace at the preliminary hearing and it was admitted over the objection of defendant. Bernice Intes was also recalled and introduced in evidence a statement of employee earnings and payroll deductions from Rheem Manufacturing Company, Chicago, Illinois, which showed her working each week during the month of September, 1944. This evidence was introduced for the alleged purpose of refuting the evi-

dence of defendant that prosecutrix had gone to Oklahoma in September, 1944, before he had made a trip to Chicago in November, 1944.

The county attorney testified that in a conversation with defendant at the time of his arrest, defendant asked him with what he was being charged and upon being told he stated that he did not know she had any money at all. He further swore that in conversation with the brother of defendant at about the same time the brother stated, "I don't think she had any money. I don't think he could have stolen that much because I don't think she had any money."

The record will not sustain the contention of defendant that the prosecutrix was not a competent witness for the reason that she was his common law wife, for the reason that the testimony of both the prosecutrix and defendant was that they intended to marry in the future, although each of them testified that they were living together as pretended husband and wife. The prosecutrix specifically denied that she was ever married to defendant and defendant was just as emphatic that he was never married to the prosecutrix. Their relationship was meretricious.

In the case of Nichols v. State, 50 Okla. Cr. 409, 298 P. 886, it is held:

"A common-law marriage may exist in this state, and, when parties capable of entering into the marital relation agree to and become husband and wife, and in pursuance of this agreement enter into and thereafter maintain the marriage relation, the common-law marriage exists. * * *

"The burden of proof of incompetency of a witness rests upon the one who raises such question."

In the body of the opinion it is stated:

"In re Love's Estate, 42 Okla. 478, 142 P. 305, L. R. A. 1915E, 109, that court said:

" 'A common-law marriage exists where competent parties agree to be and become immediately man and wife and pursuant thereto enter into and maintain thereafter the marriage relation.'

"In the case of Hughes v. Kano, 68 Okla. 203, 173 P. 447, 448, that court defines common law as:

" 'A common-law marriage may exist in this state, and when parties capable of entering into the marital relation agree to be and become husband and wife, and in pursuance of such agreement enter into and thereafter maintain marriage relation, a common-law marriage exists.

"To the same effect is the case of Baker v. Jack, 112 Okla. 142, 241 P. 478.

"In re Wells' Estate, 123 App. Div. 79, 108 N. Y. S. 164, 166, that court said:

" 'A common-law marriage is defined as any mutual agreement between the parties to be husband and wife in praesenti, especially where it is followed by cohabitation, if there is no legal disability on the part of either to contract matrimony.'

"In re Callery's Estate, 226 Pa. 469, 75 A. 672, that court said:

" 'A common-law marriage is not affected by occasional cohabitation after an express promise to have a marriage ceremony performed, which is not fulfilled. Cohabitation and reputation conjoined are the essential facts from which a presumption of common-law marriage arises.'
* * *

"It clearly appears from the evidence that there was no mutual agreement in praesenti between these parties to be husband and wife before they began to cohabit with

each other. Theirs was simply a state of fornication and not of marriage. It takes more than this to create the relation of common-law marriage in the state of Oklahoma."

In Cavanaugh v. Cavanaugh, 135 Okla. 204, 275 P. 315, in the first paragraph of the syllabus, it was held:

"To constitute a valid 'common-law marriage,' it is necessary that there should be an actual and mutual agreement to enter into a matrimonial relation, permanent and exclusive of all others, between parties capable in law of making such contract, consummated by their co- habitation as man and wife, or their mutual assumption openly of marital duties and obligations. A mere promise of future marriage, followed by illicit relations, is not, in itself, sufficient to constitute such marriage."

35 Am. Jur. 209 § 41, reads as follows:

"An agreement to cohabit for the present and to marry later is not a marriage although there is cohabitation. There can be no contract per verba de praesenti where the marital status is to become fixed in the future. This rule applies where a future marriage cannot be had until a future convenient time, as when an existing spouse dies or a ceremony can be performed. It has been held that no marriage is shown by a man's acknowledgment of a woman as his wife in the presence of others and by their living together as man and wife for one week prior to his death, where their intention was to have a marriage ceremony performed the next week, which ceremony was prevented by his death."

It is established law that venue of an offense must be proved as alleged in the information. However, it does not have to be proved beyond a reasonable doubt and may be proved by circumstantial evidence. Ward v. State, 13 Okla. Cr. 81, 162 P. 232; Steele v. State, 28 Okla. Cr. 335, 230 P. 760; Nix v. State, 20 Okla. Cr. 373, 202 P. 1042, 26 A. L. R. 1053; Everidge v. State, 50 Okla. Cr. 144, 3 P. 2d 750.

Although there is no direct evidence that the money was stolen from the prosecutrix in Payne county, the circumstances strongly point to that conclusion. The money was placed in envelopes at the suggestion of defendant, the envelopes were placed in her purse and the purse in turn was locked in a trunk. The key was left in a coat hanging by the trunk. The defendant was left alone in the room where the trunk was located for 30 minutes or more. This was the only time after the money was placed in the envelopes that the purse was out of the immediate presence of the prosecutrix until she discovered the loss the next morning. She carried it with her all of the remainder of the day and placed it under the mattress that night. It is almost inconceivable that the defendant could have removed the purse from under the mattress where the prosecutrix was lying, remove the money, substituted envelopes stuffed with newspaper clippings and then placed the purse back under the mattress without arousing the prosecutrix. The circumstances strongly point to a taking in Payne county.

In addition to that it is provided by statute:

"When property taken in one county, by burglary, robbery, larceny, or embezzlement, has been brought into another, the jurisdiction of the offense is in either county. * * *" 22 O. S. 1941 § 128.

The circumstances are strong that the defendant had possession of some of the stolen money in Payne county after the trip to Tulsa. It was there he paid for the automobile and the rent on the farm, and he had the money which he carried to Pawnee to make the payment for the furniture.

This case in its final analysis involves questions of fact for the determination of the jury. If they believed

the testimony of the prosecuting witness, they probably also concluded that the money used by the defendant in making these purchases was a part of the money taken from the prosecutrix. This court has long adhered to the ruling that it will not disturb the finding of the jury on a disputed question of fact where there is any competent evidence in the record to sustain their finding. The evidence here was sufficient if it be credited by the jury to sustained the verdict of guilty.

There is one other proposition presented by counsel for defendant. In rebuttal the county attorney introduced the transcript certified by the justice of peace to the district court after the preliminary examination of the defendant. This transcript included all of the papers filed before the justice of the peace, but did not include a transcript of the evidence taken at the preliminary hearing. The defendant had testified that when he was placed in jail he was denied bond by justice of peace and never had a bond fixed for him until some months later when he was arraigned in the district court after the information had been filed against him in that court. The justice of the peace who held the preliminary hearing was called as a rebuttal witness and he testified that he fixed the defendant's bond at $2,500 at the time he was brought before him for arraignment, and that after he made an order binding the defendant over to district court he made a further order fixing bail for defendant in the sum of $2,500. The transcript of the record of the preliminary examination was admitted in evidence purportedly to support the statement of the justice of peace.

We agree with the contention of the counsel for defendant that this transcript was immaterial, contained many hearsay statements and should not have been admit-

ted as evidence. However, we fail to see where the defendant was prejudiced in any way by the admission of this evidence. There is no statement in the transcript which could have possibly had any bearing on the outcome of the case. For that reason we hold that its admission as evidence was harmless error.

The judgment is affirmed.

BAREFOOT, P. J., and BRETT, J., concur.